UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

```
USA,                          .    Docket No.
                              .    1:22-CR-00398-MKB-1
        Plaintiff,            .
                              .
          v.                  .    Brooklyn, New York
                              .    Friday, February 2, 2024
CALEB APOLINARIS,             .    11:37 a.m.
                              .
        Defendant.            .
  . . . . . . . . . . . . .   .
```

TRANSCRIPT OF BOND HEARING
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | United States Attorney's Office<br>Eastern District of New York<br>JOHN O'DONNELL ENRIGHT, AUSA<br>271 Cadman Plaza East<br>Brooklyn, New York  11201<br>718-254-6203 |
| For the Defendant: | Federal Defenders of New York, Inc.<br>MICHAEL K. SCHNEIDER, ESQ.<br>One Pierrepont Plaza<br>16th Floor<br>Brooklyn, New York  11201<br>713-330-1200 |
| Also Present: | Joy van Hasselt, Social worker intern for the Federal Defenders<br>Moise Apolinaris, Defendant's Father<br>Mildred Apolinaris, Defendant's Mother |
| Transcription Service: | Superior Reporting Services LLC<br>P.O. Box 5032<br>Maryville, TN 37802<br>865-344-3150 |

1    Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  Government calls for bail application,

3    USA versus Caleb Apolinaris, case number 22-CR-398.

4              Counsel, your name for the record for the

5    Government.

6              MR. ENRIGHT:  Good morning, Your Honor.  John

7    Enright for the United States.

8              THE COURT:  Good morning.

9              THE CLERK:  For Defendant.

10             MR. SCHNEIDER:  Federal Defenders by Michael

11   Schneider for Mr. Apolinaris, who is present.  Also at

12   counsel table is Joy van Hasselt, a social worker intern with

13   the Federal Defenders.  Good morning.

14             THE COURT:  Good morning.

15             THE CLERK:  Thank you.

16             THE COURT:  You're free to remain seated

17   (indiscernible).

18             Good morning, Mr. Apolinaris.

19             THE DEFENDANT:  Good morning.

20             THE COURT:  Okay.  I believe it's the Defendant's

21   application?

22             MR. SCHNEIDER:  Yes, Your Honor.  We're asking for

23   the Court to release Mr. Apolinaris on a $50,000 bond signed

24   by himself obviously and also his parents who are in the

25   audience, Mildred and Moises Apolinaris.

1          Mr. Apolinaris has been at the MDC now for 16

2    months, as this Court knows.

3          THE COURT:  I'm sorry.  For how many months?

4          MR. SCHNEIDER:  Sixteen.  His initial appearance in

5    this court was on August 4th, 2022, so a little over 16 at

6    this point, I think.

7          THE COURT:  What's anything of note that happened

8    while he was in pretrial detention, any issues?

9          MR. SCHNEIDER:  I would let Mr. Apolinaris address

10   that but too many to mention.  Acts of violence that he's

11   witnessed.  Stabbings?

12         THE DEFENDANT:  Stabbings, seven --

13         MR. SCHNEIDER:  Seven.

14         THE DEFENDANT:  -- in the last month.

15         MR. SCHNEIDER:  He's been locked down, I would say,

16   a majority of those 16 months, meaning kept in his cell

17   except to be let out to eat and sometimes they get cold food

18   to eat in their cells.  And that's just the general situation

19   at the MDC now.

20         THE COURT:  Any disciplinary issues for him?

21         MR. SCHNEIDER:  Not that I'm aware of.

22         Any hits?

23         THE DEFENDANT:  No.

24         MR. SCHNEIDER:  No.  I mean --

25         THE DEFENDANT:  Kept to my cell.

1          MR. SCHNEIDER:  -- I have been representing Mr.

2    Apolinaris for quite a while now, I think more than a year.

3    I took over for one of my colleagues.  But I visited him

4    quite often.  He's never been in the SHU when I visited.  So

5    I'm unaware of any disciplinary incidents.  As he said, he's

6    kept to his cell almost entirely.

7          So I do think the Court could consider those

8    conditions in considering our application.  I think more

9    importantly is the fact that his parents willing to sign the

10   bond.  I do know we have a pretrial report from more than a

11   year ago which indicates that they had a strained

12   relationship at the time.  That relationship has been

13   repaired.  His parents are here.  They visit him at the MDC

14   regularly.  They --

15         THE COURT:  Is his father employed now?

16         MR. SCHNEIDER:  His father's not employed now, but

17   he is willing to sign the bond for moral suasion.

18         But they're at the point, over the months since his

19   arrest, of coming to understand Caleb's seriousness in

20   dealing with the case.  And they trust him to do what he's

21   supposed to do should the Court grant this application.  So I

22   believe that obviously warrants consideration by the Court.

23         I understand this is a presumption case.  I think

24   the presumption is easily overcome just by my client's

25   background.  You know, he's born and raised in Brooklyn.

1  He's lived here his entire life.  He's not really a risk of

2  flight.  And any risk of flight, any risk of dangerousness,

3  it's overcome, not just by his parents agreeing to sign the

4  bond and ensure his return to court and abidance by the

5  conditions, but by our proposed conditions which are that he

6  would be released to an inpatient drug treatment program.

7  Samaritan Village will have a bed for him early next week.

8  And he would enter that program and the condition of the bond

9  would be that he'd have to remain in inpatient treatment

10 until successfully completed.  And our understanding is that

11 that program would take at least six months.

12          So those strict conditions of release, I think,

13 clearly overcome the presumption and give the Court

14 confidence that my client will return to court when he's

15 supposed to and that he won't pose a danger.  And I will say

16 this, I think when he was arrested, as you've read in the

17 pretrial report, you know, he was addicted to heroin, he was

18 using opioids every day.  And in that situation, perhaps

19 release would not have been warranted.  But he's not in that

20 situation anymore.  We're 16 months removed from that.  He's

21 committed to living a sober life.  And at the drug program he

22 will necessarily have to.  He will be drug tested as well as

23 just being in a secure place where contraband is not easily

24 found.

25          So the fact that his parents trust him enough to

1    sign this bond --

2            THE COURT:  I'm sorry.  Where contraband is not

3    easily found, which place is this?

4            MR. SCHNEIDER:  Samaritan Village.

5            THE COURT:  Okay.

6            MR. SCHNEIDER:  I understand people use drugs at

7    Samaritan Village, and I've had people do that.  But it's not

8    something that -- it's something that somebody has to seek

9    out.  It's not as if I'm saying let Mr. Apolinaris out --

10            THE COURT:  Yeah.  I think --

11            MR. SCHNEIDER:  -- onto the street, you know, where

12    temptations will be different.

13            THE COURT:  My other concern that perhaps is not as

14    great a concern now but I think, Mr. Apolinaris, you

15    voluntarily left a detox program before the arrest.  And I

16    know why people leave detox programs, you know, it's painful.

17    But that's part of your record as well.  Why should I believe

18    that you will remain in that program for six months when you

19    haven't been able to in the past?  What's changed?

20            MR. SCHNEIDER:  Is that directed to me or Mr.

21    Apolinaris?

22            THE COURT:  Whoever wants to answer that question.

23            MR. SCHNEIDER:  Well, I --

24            THE DEFENDANT:  (Indiscernible).

25            MR. SCHNEIDER:  Right.  I'll answer the question,

1    and I'll let Mr. Apolinaris chime in if he wants to.  He was

2    a heroin addict and, as the Court is aware, like, you leave a

3    detox program because you can't handle detoxing.  But we're

4    16 months from that.  So he has detoxed, meaning he's not

5    going to have those same urges.  Not that he doesn't need

6    rehabilitative treatment, which is why we're suggesting

7    Samaritan Village would treat, sort of, underlying issues

8    about his drug use.  But we're not in a situation where he's

9    going to be in withdrawal.

10           And you could trust him, I think, because he wants

11   to do this.  And this is not an off-the-cuff application that

12   we've made.  He's been in detention for 16 months.  We've had

13   these discussions -- I've had these discussions with him, and

14   he feels ready to do this.  And he knows it's a challenge,

15   but he's committed to doing it.  And I will say this, he

16   understands the consequence of not completing the program is

17   going back to, I mean, what are we going to say, like, one of

18   the worst detention facilities certainly in the state.  I

19   mean, the punitive nature of confinement at the MDC is

20   terrible, but it also, in this case, gives Mr. Apolinaris a

21   great motivation not to mess up in the program because he

22   knows where he'll go if he does.

23           THE COURT:  You know, I'm not a mind reader.  I

24   don't have a crystal ball.  There's no way for me to read

25   your mind and see whether you've flipped a switch and are

1    ready to change and be committed to a drug-free life.  I'm

2    sure you understand that if you were released and you did go

3    to Samaritan Village and then you left, you'd be

4    automatically remanded and that probably would affect your

5    sentence if you're convicted in this case.  So you have a lot

6    at stake by wanting to do this.

7                    THE DEFENDANT:  Yes.

8                    THE COURT:  So what's changed?  I mean, I don't

9    want you to talk about guilt or innocence, but what's changed

10   about your relationship to drugs?

11                   THE DEFENDANT:  When I first came to -- to MDC, I

12   didn't think I was capable of changing or capable of

13   improving.  But in the last 16 months, I have completed five

14   courses of the Change (indiscernible) Me program, it's a --

15   it's a booklet where you get certificates for it.  I've

16   completed five of those.  I have successfully tapered off of

17   (indiscernible) program.

18                   My motivation is just, what I was doing in my past,

19   it wasn't conducive.  It wasn't -- it wasn't -- it wasn't

20   good for my life.  And I have children that I need to be a

21   role model to.  And I'm not saying that I'm not being

22   rehabilitated where I am, but I do need extra help.  I do

23   need more of a rehabilitation process, rather than prison.

24   I'm coming from doing four bundles a day.  That's a lot of

25   heroin to -- wanting to change my life so badly that I -- I

1    didn't want to put in a bail application until I felt as

2    though I was ready to actually make this change and follow

3    down this course.  And I feel as though I am.

4              THE COURT:  Thank you.

5              Anything else?

6              MR. SCHNEIDER:  I just want to make it clear that

7    if the Court was to grant the application, we would ask it to

8    be stayed and for Mr. Apolinaris to come back on Monday --

9              THE COURT:  When there's a bed.

10             MR. SCHNEIDER:  -- to be released.  When there's a

11   bed.  But also because there's apparently a criminal court

12   warrant that the Government has indicated in their letter and

13   I'd feel more at ease if my client was released early in a

14   week.  So if he is taken to criminal court, I'm sure he'll be

15   released there, he'd still have time to go to Samaritan

16   Village.  Even if he was held overnight there, he could go on

17   Tuesday once there's a bed available.  I wouldn't want that

18   to happen on a Thursday or Friday and there be a weekend

19   looming.  So we would ask that -- if our request is granted,

20   that he be brought back Monday for the order to be issued.

21   And if he's taken to criminal court, we'll arrange for him to

22   get to Samaritan Village after his appearance there.

23             THE COURT:  Is location monitoring permitted in

24   Samaritan Village?

25             MR. SCHNEIDER:  I'm unaware of that.  I've never

1   had somebody there.  But if that's a concern of the Court, we

2   can reach out and report on Monday, if it's possible, for

3   location monitoring and a pretrial can set him up.  We have

4   no objection to that.

5            THE COURT:  Because one of my concerns would be,

6   I'm assuming that your commitment would be strong --

7            THE DEFENDANT:  Very.

8            THE COURT:  -- but there are temptations.  And I

9   would want to know, if I were to even entertained this, when

10  you left, if you left the program.  Because that would be a

11  bright line that you can't cross.

12           THE DEFENDANT:  I would not cross that line.

13           MR. SCHNEIDER:  As I said, Your Honor, I understand

14  the Court's concern.  You know, lots of things can happen in

15  inpatient programs, as we're all aware through our

16  experience.  My client is committed.  But I have discussed

17  this with him quite a bit.  And he understands, if something

18  was to happen in the program and he felt forced to leave or

19  he was asked to leave, he understands that he would come

20  straight to court.  Like, I really don't think that flight is

21  a risk here.  He's never really left Brooklyn.  It's not the

22  sort of case -- of course there's dangers of somebody with a

23  history of addiction not doing the right thing, but not

24  appearing in court I don't think is one of those in this

25  case.

1          THE COURT:  I see a pretrial services officer had a

2     response.

3          PRETRIAL SERVICES OFFICER:  I conferred with a

4     substance abuse specialist and he stated that inpatient

5     monitoring is allowed.

6          THE COURT:  Is allowed.

7          PRETRIAL SERVICES OFFICER:  Is allowed.

8          THE COURT:  Okay.  All right.  I'm less concerned

9     about risk of flight.  I'm more concerned about risk of

10    leaving the program and not coming back.  But, you know,

11    people change.  They can change.  They can overcome their

12    substance abuse.  I've had many people in my reentry court

13    who have done that.  And what's critical before that happens

14    is they have to say, I'm going to do it -- not I'm going to

15    try to do it, but I'm going to do it, and I will do it.  And

16    if that's what I hear you're saying, then I'll listen to that

17    with open ears and an objective mind and hear with the

18    Government has to say.  So are you totally committed to --

19         THE DEFENDANT:  Yes.

20         THE COURT:  -- staying there no matter what --

21         THE DEFENDANT:  Yes.

22         THE COURT:  -- even if it's difficult and not a

23    place you want to be?

24         THE DEFENDANT:  Yes.

25         THE COURT:  And even if you think their rules are

1    stupid?

2         THE DEFENDANT:  I have to follow them.

3         THE COURT:  Okay.

4         Anyway.  Let me hear from the Government.

5         MR. ENRIGHT:  Thank you, Your Honor.  I'd like to

6    just make a few points.  First, as has already been stated

7    but to be clear, this is a Fentanyl fatal overdose --

8         THE COURT:  Right.

9         MR. ENRIGHT:  -- prosecution.  It's thus a

10   presumption case.  And I'd like to just start by putting into

11   context the length of the Defendant's amount of time in the

12   MDC against the sentencing exposure he faces if, in fact,

13   convicted, Your Honor.  And with respect to that, I will say

14   that we've been before Judge Brodie for those 16 months.  I

15   would advise the Court that we are in and have been in plea

16   discussions that I would characterize as advanced.  If we're

17   unable to reach a plea, I believe at our last status

18   conference before Judge Brodie, the expectation is that we

19   would, in fact, set a trial date at our next status

20   conference.

21        As to the Defendant's guidelines exposure, in light

22   of the distribution of Fentanyl that resulted in the death of

23   a young victim, Your Honor, the Defendant's guidelines range

24   is 235 to 293 months without any reduction for acceptance of

25   responsibility.  So the 16 months that have been served in

1    the MDC are absolutely dwarfed by that potential guidelines

2    range.  And I obviously make that point, Your Honor, because

3    it serves as, in the Government's view, a very real motive

4    for the Defendant, if released, to flee.

5            Again, this is a presumption case.  The Defense

6    proffers essentially two grounds to rebut that presumption

7    and alternatively to each in turn, Your Honor.  The first is

8    the Defendant's ties to New York and his family.  The

9    Government does not dispute that the Defendant, as we

10   understand it, is a lifelong New Yorker.  What the Government

11   does want to argue to Your Honor as we set forth in our

12   submission and as Defense Counsel eluded, at the time of his

13   arrest, the Defendant told pretrial services that he had no -

14   or, excuse me, limited or occasional contact with family

15   members including his mother.  My understanding is that

16   pretrial services interviewed his mother at the time of the

17   Defendant's arrest.  His mother at that time was not willing

18   to, as I recall, act as a sureter on any proposed bond and,

19   in fact, informed pretrial services that she believed that

20   the Defendant would not return to court if released and

21   without treatment.

22           THE COURT:  Without treatment.

23           MR. ENRIGHT:  Without treatment.  Now, Your Honor,

24   I make that point simply because we are now 16 months.  My

25   understanding, and I have not heard Defense to claim that

1   there is any need for detox, that what is being proposed is

2   long-term treatment for historical substance abuse.  The

3   Defendant's proffered ties to his family, again, there was no

4   mention of his father at the time of his arrest.  What the

5   Defendant is now proposing, obviously, is to assure there is

6   a mother who, at least at the time of the arrest, had

7   occasional contact with the Defendant and the Defendant had

8   no other familial ties.

9           His ties to what I understand to be his two

10  children, the mother of those children dovetails with the

11  Defendant's second argument that there's no history of

12  criminal convictions which, in the Defendant's view, you

13  know, supports the notion that he's not a danger or a risk of

14  flight.  The Government disagrees, Your Honor.

15          We don't dispute that there are no criminal

16  convictions that we can report to Your Honor.  However, what

17  I can proffer to Your Honor is frankly a life of lawless

18  conduct.  The Government's investigation has revealed that

19  the Defendant -- his history of narcotics distribution is not

20  limited, of course, to the victim in this case.  Rather he

21  was a drug dealer who historically dealt heroin, other

22  narcotics.

23          As for his interactions with law enforcement, as

24  Defense eluded, he was arrested on State charges in June of

25  2021 -- so approximately a year prior to his arrest -- for

1   possession of a controlled substance and, more disturbing,

2   Your Honor, charges of endangerment of the welfare of a

3   child.  I can proffer to Your Honor that that charge stems

4   from the Defendant's alleged locking of his two children in a

5   car for a period of time -- I believe, Your Honor, it was a

6   period of hours.  In connection with that State prosecution,

7   two bench warrants were issued, one in April of 2022 that was

8   then extinguished, but a second bench warrant was issued in

9   May of 2022.  My understanding, as reported by pretrial

10  services, is that bench warrant was nonexpiring; it's thus

11  live, as Defense Counsel has eluded to.

12      So the lack of any criminal convictions, Your

13  Honor, I would submit does not present a full accurate

14  picture of the Defendant's criminal history.  To the extent,

15  Your Honor -- and let me just pause and say that for those

16  reasons, you know, the proffer basis that the presumption of

17  the continued detention has been rebutted here, the

18  Government would submit, has absolutely failed.

19      Even if Your Honor were to entertain releasing the

20  Defendant, you know, the proposed package of a $50,000 bond

21  secured by his parents is, in the Government's view, wholly

22  inadequate.  Again, I've proffered to Your Honor what was

23  told to pretrial services at the time of arrest as to the

24  Defendant's familial ties.  My understanding, I believe the

25  Defense has confirmed, that the father is unemployed, is

1    presently without income.  My understanding is that the

2    second sureter, his mother, has an annual income of

3    approximately $60,000.

4           In light of his limited contact with family prior

5    to his arrest, Your Honor, I would respectively submit that

6    he has very little to lose in terms of incentive to flee, to

7    present a continued danger to the community.  $50,000,

8    although for a sureter with a $60,000 income, I understand

9    that's a significant sum of money; but in light of his

10   relationship with these proposed sureters, historically, Your

11   Honor, and in light of the very substantial potential

12   sentence he faces if convicted, he has little to lose.  And I

13   would submit to Your Honor that, you know, any moral suasion

14   here, if not entirely absent, is exceptionally limited.

15           Unless Your Honor has any questions, I will pause.

16           THE COURT:  Go ahead.

17           MR. ENRIGHT:  I have no further argument at this

18   time.  The only other point I'd like to make to Your Honor,

19   family members of the victim are in attendance today, Your

20   Honor.  If Your Honor would like to hear from one or both of

21   them, I know that at least one of them is prepared to make a

22   statement in opposition to the Defendant's application.

23           THE COURT:  Okay.  I do need to hear from both

24   sureters.

25           So the questions, the danger to the community, what

1   is it specifically that the Government fears will happen?  I

2   understand the risk of flight and why you believe there is a

3   risk of flight.  I think I understand why you think there may

4   be a danger, but I'd like to hear.

5         MR. ENRIGHT:  Yeah.  The immediate danger, Your

6   Honor, is that when last left in the community, the

7   Defendant's conduct is alleged to have caused the death of a

8   25-year-old.  The Defendant does not have, to the best of the

9   Government's knowledge, a work history, a strong familial

10   structure to turn to, to rely on for financial support, et

11   cetera.  The concern, to put it more bluntly, Your Honor, is

12   that the Defendant flees Good Samaritan [sic].  Best case

13   scenario, he does not turn back to dealing drugs, including

14   Fentanyl.  But the risk being that he does and that there's

15   further damage inflicted up to and including causing the

16   death of another.  So that's the danger.  In the Government's

17   view, it's very real, Your Honor.

18         THE COURT:  All right.  Could I hear from the

19   sureters?

20         MR. SCHNEIDER:  Yes.  Can I have you step up here?

21         THE CLERK:  To the podium, please.  I guess, Mr.

22   and Mrs. Apolinaris.

23         THE COURT:  Good afternoon, ma'am, sir.  Thank you

24   for coming in.  You'll be placed under oath and then I'll

25   have some questions to ask you.

1       THE CLERK:  Okay.  Let me just swear you both to

2  answers you're about to give to Judge Levy.  Please raise

3  your right hand.

4              MOISES APOLINARIS,  WITNESS, sworn

5              MILDRED APOLINARIS,  WITNESS, sworn

6       THE CLERK:  Sir, can you please state your name for

7  the record?

8       MR. M. APOLINARIS:  Moises Apolinaris.

9       THE CLERK:  Thank you.

10      Ma'am, your name for the record?

11      MS. APOLINARIS:  Mildred Apolinaris.

12      THE CLERK:  Thank you very much.

13      Okay.  Judge Levy.

14      THE COURT:  So could I hear from each of you how

15 you feel about this bail package and about signing a bond.

16 Whoever would like to go first.

17      MR. M. APOLINARIS:  Well, first after what I just

18 heard --

19      THE COURT:  Excuse me.  Would you like to sit down?

20      MS. APOLINARIS:  Yes.  I have back problems.

21      THE COURT:  Yes.  Why don't we get a chair for you.

22      MR. M. APOLINARIS:  It's interesting to me how

23 someone can come up with conclusions off of a piece of paper

24 and history that -- that they have no idea what they're

25 talking about.  I had a strained relationship with my son

1  because he's a drug addict from very young.  My son's not a

2  killer.  He's not a murder.  He did many things.  And -- and

3  distribution charge, yeah, absolutely.

4          The enemy in this courtroom is not him.  The

5  enemy's still out there.  He's not the one that had that

6  young man killed.  And I'm sorry.  I'm sorry.  I really am.

7  Believe me, it hurts.  Because he has died himself from the

8  drug addiction.  The enemy is drug use.  The enemy is the

9  drug addiction.  And that's what had him in the state that he

10 was in.

11         You know what it is to chase somebody and then have

12 them reject you because they're constantly high.  You don't

13 know if they're dead or alive because they won't call you.

14 And this is -- this is -- the reason why I'm here is because

15 I love my son.  He's my son no matter what.  So I don't give

16 a crap what a piece of paper says -- I'm sorry, Your Honor --

17 I don't care what you think happened.  I know what happened.

18 I know that young -- that young man's life -- I know what he

19 went through and what we went through.  To hear that he's in

20 a -- that he's in a trap house dead -- dead from drug

21 overdose.  To know that the young man that perished, Lord,

22 used with him -- used with him.  Addicts.

23         As parents -- you know what we go through as

24 parents?  To think that it's our fault.  We look in the

25 mirror and we think, what -- what the hell did we do wrong?

1   After we've chased them, after we've loved them, after we've

2   been there for him, the whole damn thing, none of it matters.

3   It's not the dealer.  Because you're going to go to somebody

4   else.  There's nothing you could do.

5         So the fact that he wants to go to drug rehab -- to

6   get him to go to drug rehab, do you know how difficult that

7   is?  And maybe -- maybe it's the 16 months that they kept him

8   in there because they wouldn't do a damn thing about it --

9   okay -- to -- to drag this thing along while he's been

10   threatened -- okay -- while he's had to face many things in

11   that cell including insanity.  Maybe that's part of the plan

12   too.  To break him.

13         This ain't no act.  This is a father.  This is a

14   father.  And I understand you got to do a job.  Everybody got

15   to do -- everybody got to play their part here.  And that's

16   what I'm doing here.  I'm putting my name on the piece of

17   paper --

18         UNIDENTIFIED VOICE:  Mr. Moises --

19         MR. M. APOLINARIS:  Sorry.  Yeah.  Okay.  Yes.

20   Absolutely.  Absolutely.

21         UNIDENTIFIED VOICE:  You can't be doing that.

22         MR. M. APOLINARIS:  Absolutely.  I'm sorry.  I'm

23   sorry.  I'm sorry.  But I'm going to put my name down on the

24   piece of paper for my son, and so is she.  We've been there

25   for the duration, through the hits and everything else.

1    We'll be there for the rest.  No matter how -- he's got to do

2    time.  He's got to do time.  But if he can get some --

3    some -- some time to actually get into a program where

4    something is going to help him, some tools -- they're going

5    to give him some tools to help him, so that when he gets out,

6    he'll be a better man maybe.  That's all we're asking for.

7              You want to say something?

8              THE COURT:  Thank you.

9              MR. M. APOLINARIS:  I'm sorry for getting the way I

10   got.  It's just been -- this has been a long, long thing

11   happening.

12             THE COURT:  I hear what you're saying.

13             Ma'am?

14             MR. M. APOLINARIS:  She doesn't want -- she doesn't

15   want to say nothing.

16             MS. APOLINARIS:  I'm going to get so emotional.  I

17   love my son.  And the fact -- when he read that I would not

18   do anything to help him in his rehab or help him with bond is

19   not true.  Because I did speak with a couple of people.  I

20   said, if this program is not going to help him, I'm not going

21   to go with it.  If there's something that he wants to do and

22   he truly wants to do, I will support him.  I have supported

23   him all his life.

24             The reason why we've been estranged is because he

25   refuses to reach out to us when we reach out to him.  Just

1  like Moises said, he's rejected us time and time and time

2  again and it's all because of the drug abuse.  I tell Caleb,

3  I love him no matter what.  We will always stand by him, no

4  matter what.  Even when he rejects us.  Even when he says

5  lies about us.  But that was all due to his drug addiction.

6  Yeah.  Maybe these 16 months have really made him

7  reflect on what life is, what freedom is, because this is

8  what we talk about on the phone.  And I know he doesn't want

9  to hear what I have to say.  I say, you have time, no pun

10  intended.  All you have time right now is to reflect on the

11  past, the life you've led, and where it's led you to.  You

12  have children to think about.  Right now is you and the Lord

13  helping you through this.  And he knows how much we love him.

14  There's nothing that we wouldn't do for him.  So estrangement

15  yes, because of him not because of us.  We've always seeked

16  him out.

17  And if this program is something that he really

18  truly wants to do and he's ready for it, well, then praise

19  the Lord.  Because it's been a very difficult time throughout

20  the years that we've been with him.  And he can tell you how

21  many drug rehab places I have called to place him in.  He's

22  been interviewed for many of them, and he's never chosen to

23  go to them because the addiction was so strong.  He was not

24  strong enough to do those programs.  And I think that now,

25  with these 16 months, reality has set in on what life is

1  without freedom.

2            Yeah.  Time.  He's going to have to do time.  We're

3  aware of that.  We are aware of that.  And if this program is

4  going to help him not just with the fact that he needs to

5  rehabilitate -- rehabilitation is not just the drug use, it's

6  the mental aspect behind it.  How do you deal with the

7  pressures that are presented before you?  Are you mentally

8  strong to say, I will not do this because these actions have

9  caused me to be in this facility and not even be there for

10  his two daughters, which I know that he adores?  And,

11  unfortunately, because of his drug addiction, he did put them

12  in danger.  He did put them in danger.  And I know that he is

13  guilty.  And I know that he feels horrible for that.  But

14  that's nothing that we can do.  That's something that he

15  would have to deal with.

16            So if -- if this is granted, then I am happy for it

17  because I know that he's ready for it.  And that -- that is

18  all I have to say.

19            THE COURT:  Have you noticed any change in him over

20  the last 16 months?

21            MS. APOLINARIS:  Yes.  I have noticed that his

22  mentality has changed, wanting to change, missing out on

23  being with his daughters.  Now he's been able to speak to the

24  older one because they have -- they're two different mothers.

25  She's been giving him the privilege to call the house to

1  speak with her because I know she asks for him.  And when we

2  have her -- both the girls on the weekends, you know, when he

3  calls, he talks to them.

4          MR. M. APOLINARIS:  There's more the sense of --

5  the term is consequential thinking --

6          MS. APOLINARIS:  Yeah.

7          MR. M. APOLINARIS:  -- you know, a -- a -- a better

8  awareness that I've noticed.  Because in the past when we've

9  spoken to him he's -- he's been more reactionary than

10  anything else.  Now it's more, let me think about what I'm

11  going to do.  Which probably led him to this decision

12  because, you know, he was -- he was -- he kept talking about

13  how he was scared he wasn't going to make it, you know -- you

14  know, in the program.  And he finally decided, this is

15  something I've got to do, you know.

16          It's not -- it -- it's easy to say, you know, it's

17  just to get out of this place.  But the thing is that when

18  you're in this place, you develop a certain mentality and a

19  certain armor that you -- that you walk around with.  And

20  there's a certain system that you're used to.  So it's --

21  it's -- I consider it a -- a very courageous thing for him to

22  do to step out of that environment that he's been used to,

23  constantly watching over his back and everything else.  It's

24  not like anything you and I know out here.  To step into

25  something new where, as I understand it, the place is -- is

1   maybe just as dangerous, but at least, like I said, they're

2   giving him tools so that he can use later on, you know.  And

3   that's -- that's where the discussions have been.  So that's

4   the change we've seen, you know.

5             THE COURT:  Thank you.

6             Any questions from the Government or the Defense?

7             MR. SCHNEIDER:  Not from the Defense.

8             MR. ENRIGHT:  No questions, Your Honor.  I would,

9   again, just note that family members of the victim are

10  present.  And I'm happy to pause and inquire with them or if

11  Your Honor would want to hear from them.  Or if unnecessary,

12  Your Honor -- if Your Honor were to conclude it's

13  unnecessary, I'll just --

14            THE COURT:  First of all, I'd like to speak to them

15  and whether they wish to be heard.

16            MR. ENRIGHT:  May I, Your Honor?

17            THE COURT:  Yes, of course.

18            You may take your seats.  Thank you.

19            MR. ENRIGHT:  I understand that one or both would

20  like to be heard, Your Honor.

21            THE COURT:  Okay.

22            MS. FALLON:  Hello, Your Honor.

23            THE COURT:  Good afternoon.

24            MS. FALLON:  Good afternoon.  I'd like to introduce

25  myself.  My name is Serena Fallon.  I am the mother of the

1  young man who passed away from Fentanyl that the Defendant is

2  alleged to have sold to him.  I listened to the Apolinaris

3  family, and I didn't hear any sorrow or apology towards the

4  death of my son.  They feel he's blameless.  My son did not

5  come to you for Fentanyl -- for pure Fentanyl, and that's

6  what you gave him, and you killed him.

7       My son struggled with drug addiction too.  But

8  unlike the Apolinaris family, Doug and I never left his side.

9  We were with him.  We put him in 20 treatment programs.  And

10 I know how easy it is, as you said, Your Honor, to walk out

11 of a treatment program.  And that is my fear.  Because I've

12 looked in the face of my son when he was struggling with his

13 addiction, and I know what it looks like when those cravings

14 are hit.  And I don't see it here.  I see a young man who's

15 smiling, laughing, his legs aren't shaking.  He doesn't look

16 like he's craving anything but a get out of MDC card.  And --

17 and I really hope that nobody in this courtroom's fooled by

18 that.

19      So if he is struggling with addiction and he has

20 been in the Federal Bureau of Prisons for the last 16 months,

21 why hasn't he asked for treatment?  The Federal Bureau of

22 Prisons has the best treatment of any prison system.  They

23 have a substance abuse program for inmates in their custody

24 and care.  They have a program called the residential drug

25 abuse program.  It allows these inmates to live in a separate

1    unit from the general population.  He can participate in a

2    full day for nine months of drug rehabilitation.

3    Additionally, the Federal Bureau of Prisons has excellent

4    medical and pharmaceutical care if the Defendant needs

5    something to help him with his cravings.  They can give him

6    Suboxone, they can give him methadone, they can give him

7    Vivitrol.

8            I haven't heard -- I've come to every single one of

9    the status hearings.  In 16 months I haven't heard him ask

10   for treatment.  Not once.  So whether or not -- whatever this

11   issue is -- and we've all decided today it's not a detox

12   issue, that it's a psychological one perhaps where he's

13   craving or he wants to be completely abstinent, the Federal

14   Bureau of Prisons can handle it.

15           As the mother of an addict, I used to pray he would

16   get arrested because the only place to get true treatment and

17   the people who succeed are the ones who get it in the prison.

18   I have put my son, like I said, in more than 20 programs.

19   When it got hard, just as you said, Your Honor, he walked

20   out.  It's this easy to walk out.  He can hit a door.  He can

21   say something to another resident or patient there and

22   immediately he's discharged.  So he can be in and out in a

23   day.

24           Obviously, I strongly object to him being released

25   into the general public to live in an outpatient drug rehab

1  center when the F -- when the Federal -- Federal Bureau of

2  Prisons can adequately meet his needs.  A community-based

3  program, even one that he would live in, cannot hold him if

4  he chooses to leave.  He'll be gone.  He can walk in and walk

5  out.  I've seen it.  I've lived it.

6         So you, Your Honor, you have the ability to offer

7  this Defendant the treatment he wants, but you can do it

8  within the Federal Bureau of Prisons if he really wants it.

9  You can -- and that would also respect the wishes of the

10  grand jury who felt that there was sufficient probable cause

11  to require a trial because there was a death.  Even though

12  the Apolinaris family doesn't recognize that their son killed

13  our son.

14         MR. M. APOLINARIS:  He didn't.

15         MS. FALLON:  He absolutely did.  Because you can

16  see your son.  You can touch him.  You can hold him.  You

17  know where I see my son --

18         THE COURT:  Excuse me.  I think we need to be less

19  personal at this point.

20         MS. FALLON:  To see my son, I have to go to the

21  cemetery and I get to touch a stone wall and talk to him

22  there.  So there is a difference about what's going on here.

23  They might have both been drug addicts, but one killed the

24  other.  And so I can't have hope for my son.  I can't see the

25  change in my son because that was taken away from me.  I will

1 never see my son marry.  I won't have granddaughters.  I

2 won't have any grandchildren.  I won't have anything.  What I

3 have is my 25-year-old on rotting away.  Their son's alive

4 and well.  And he looks very well.  He looks healthy and fit

5 and very different from the 16 months when he came in here.

6 So jail, it looks like it's been wonderful for him.

7        So I ask you, Your Honor, please, please, you want

8 to give him treatment, do it in the FBP.  It's possible to do

9 it there.  $50,000, the father has no job, she's -- she'll

10 get stuck paying it if he walks away.  Who's going to find

11 him?  He's already shown he has no regard.  He didn't have

12 regard for his children.  He didn't have regard for his

13 parents.  Whatever was going on with us and our son, he was

14 with us.  We were with him.  We were in the weeds of.  There

15 was no estrangement.  We were there.  We were there beginning

16 to end, in between.

17        So, please, I'm asking you to not give him bond or

18 bail to go to an outpatient facility that he can walk out of.

19 You can -- you can give him the treatment here if the

20 treatment is what they want.  Please, Your Honor.

21        THE COURT:  All right.  Thank you.

22        MR. FALLON:  I don't think I have anything else to

23 add.

24        MS. FALLON:  Thank you.

25        MR. FALLON:  Thank you.

1          THE COURT:  Okay.  Anything else, Mr. Schneider?

2          MR. SCHNEIDER:  Yes.  Just briefly, Your Honor, I'd

3    like to address the Government's first point.  We are in plea

4    negotiations.  And, in fact, just earlier this week I

5    received a proposed plea agreement from the Government which

6    would have the parties agree that a sentence in a guideline

7    range of 135 to 160-something months is appropriate.

8    Obviously, that's quite a discount form a 20-year mandator

9    minimum.  My client knows that.  And he knows that if he

10   messes up on bond perhaps either that agreement goes away or

11   when he's sentenced, Judge Brodie will take into account what

12   he's been doing pretrial.  So the Government's argument about

13   the severity of the guidelines here I think cuts against

14   them.

15          Mr. Apolinaris knows, and as his parents said,

16   everybody expects he's going to get a sentence in this case

17   more than 16 months.  Like, we're not asking for him to go to

18   drug treatment and then expecting him to get time served

19   after that.  I think everybody, at least on this side of the

20   table, understands he's going to get a significant sentence

21   here.  And that, I think, is just one more reason to believe

22   that he will abide by the terms of the bond including the

23   inpatient treatment.

24          And I don't want to take issue with the parents of

25   the deceased here.  Obviously that's a horrible situation.

1   But he can't get treatment in the MDC.  You and I know that.

2   The RDAP program discussed here is only available to

3   sentenced prison.  There's no such thing like that at the

4   MDC.  My client got all the treatment there was which was

5   methadone when he first went in, which he's now off of.  So

6   as long as he's at the MDC, he's not getting any treatment

7   aside from the workbooks he told you, which aren't really

8   drug rehabilitation, that's more, you know, life skills

9   training.  So if drug abuse addiction is the issue here, and

10  I think it is, I think the bond we've asked for is

11  appropriate in this case.

12          And it's true, obviously -- it's obviously true and

13  the Court knows it's true that Mr. Apolinaris could go to

14  Samaritan Village on Monday and he could walk out on Tuesday.

15  I assume he'll have an anklet on which will tell the marshals

16  where to pick him up.  But even if he didn't, there's no

17  chance that he would flee and if he did that he wouldn't be

18  found within a week.  This is a kid who's lived in Brooklyn

19  his whole life.  He has no place to go.  He understand that.

20  He understands this is his chance, not only to get clean, but

21  to at least present himself to the Judge at the time of

22  sentencing as somebody who she doesn't have to worry about

23  being an addict in the future.  So those are all reasons, I

24  think, to grant our application.

25          THE COURT:  Anything else the Government would like

1    to say.

2          MR. ENRIGHT:  Your Honor, I would just, very

3    briefly, just want to bring us back to what Your Honor

4    frankly already knows, that this is a presumption case.  The

5    proper grounds for rebutting that presumption are wholly

6    inadequate for the reasons previously stated.  Nothing

7    further, Your Honor.

8          THE COURT:  All right.  I'm going to reserve

9    decision.  I need to think about this.  But it's absolutely

10   clear that what happened here was a tragedy.  And it's a

11   tragedy obviously for the parents of the victim and a tragedy

12   for, I think, everyone here in this courtroom.  And what we

13   need to do is look at what the law requires and what will do

14   less harm and hopefully more good moving forward.

15         The plea agreement, is that issue going to be

16   resolved shortly or you're not sure?

17         MR. ENRIGHT:  It may be.

18         MR. SCHNEIDER:  It may be.  I don't know when.  I

19   mean, there's a date on the plea agreement of later in

20   February.  But I just got it.  I've only had limited time to

21   discuss it with my client.  So certainly not before I think

22   we would want to come back and have this bail issue settled.

23         My client's mother does work.  She has to take off

24   work every day to come to court.  So if the Court is going to

25   reserve, would it be possible to take her signature today on

1    a $50,000 bond in case the judge was to grant it so that she

2    wouldn't have to take off work?

3            THE COURT:  On a hypothetical bond?

4            MR. SCHNEIDER:  Well, I mean obviously you have to

5    inform her of the conditions.  So, I mean, I'm just trying to

6    avoid her having a problem at work since she did take today

7    off.

8            THE COURT:  If the bond amount were deemed to be

9    too small --

10           MR. SCHNEIDER:  I believe that they would be

11   willing to sign it.  I propose $50,000 because, honestly, I

12   don't think the amount of the bond here is a deciding factor.

13   My client is not going to run away or commit new crimes, not

14   because of the amount of the bond.  You could make it 100,

15   $150,000.  He understands $50,000 would bankrupt his parents.

16   But it's really the trust that they put in him, that he

17   reciprocates, and the nature of the conditions we propose, I

18   think, that give the Court confidence that he'll abide by the

19   conditions of the law.  But certainly, I think they would

20   sign a bond of a higher amount.  It's just, I did not think

21   that was a factor necessarily.

22           THE COURT:  Right.  Well, if you wrote a

23   hypothetical bond, if I were even to consider it, it would

24   have be higher.

25           MR. SCHNEIDER:  Okay.  Can she appear by phone at

35

1    the next appearance?

2              UNIDENTIFIED VOICE:  Yeah.

3              THE COURT:  Absolutely.

4              MR. SCHNEIDER:  Okay.  I think we could work that

5    out then.

6              THE COURT:  Okay.

7              All right.  So I'm going to reserve decision at

8    this point.

9              MR. SCHNEIDER:  Are we going to schedule another

10   date, I just --

11             THE COURT:  I might just issue a ruling before

12   that.  I'm not sure.  But obviously if the ruling were that

13   he's to be released on bond, you would have to be produced.

14             MR. SCHNEIDER:  Right.  Okay.  Well, we'll wait --

15             THE COURT:  If not, then he remains where he is.

16             MR. SCHNEIDER:  -- for the Court's decision and

17   then we'll arrange with Samaritan Village and see if they

18   have a bed at that point.

19             THE COURT:  Okay.

20             All right.  Anything else?

21             MR. ENRIGHT:  No, Your Honor.

22             THE COURT:  Okay.

23        (Proceedings adjourned at 12:27 p.m.)

24

25

1          TRANSCRIBER'S CERTIFICATE

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6                              February 6, 2024

7    *Tracey Hamilton*

8    _____    _____

9    Tracey Hamilton                    DATE

10   Legal Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Superior Reporting Services LLC
P.O. Box 5032 Maryville, TN 37802
transcripts@superiorreporter.com